**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOCELYN MORALES O/B/O<br>ELVIN J. MORALES,<br><br>Plaintiff,<br><br>v.<br><br>JO ANNE B. BARNHART,<br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CIVIL ACTION NO. 03-4061<br><br>**O P I N I O N** |

Abraham S. Alter, Esq.
James Langton, Esq.
LANGTON & ALTER
P.O. Box 1798
2096 St. Georges Avenue
Rahway, NJ 07065

　*Attorneys for Plaintiff*

Christopher J. Christie, Esq.
United States Attorney
District of New Jersey

Kimberly L. Schiro, Esq.
Special Assistant U.S. Attorney
c/o Social Security Administration
Office of General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278

1

Barbara L. Spivak, Esq.
Chief Counsel - Region II
Social Security Administration
    *Of Counsel*

    *Attorneys for Defendant*

**DEBEVOISE, Senior District Judge**

    Plaintiff, Jocelyn Morales, applied for Supplemental Security Income (SSI) benefits on behalf of her son, Elvin J. Morales ("Elvin"). The Plaintiff alleged disability as of December 13, 1993, based on Elvin's hyperactivity and asthma. The application was denied originally (Tr. 52-54) and on reconsideration (Tr. 59-61). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") to review the application *de novo*. (Tr. 62.) After a hearing, the ALJ denied Plaintiff's application. (Tr. 11-20.) On review, the Appeals Council held that there were no grounds for review (Tr. 4-5.) This action followed.

## *I. THE EVIDENCE*

**A.**     **The Hearing Testimony**

    The ALJ did not question Elvin about his condition. Plaintiff testified at the hearing that Elvin's teacher in kindergarten told Elvin that he was hyper, that Elvin had to repeat first grade, and passed second grade. (Tr. 31.) She testified that now in third grade "he's having problems" with his behavior again and "he's not finishing the things that he has to do in the classroom." (*Id.*) Elvin, according to Plaintiff, will only do work when the teacher comes around or when the Plaintiff is with him. (*Id.*) Plaintiff also testified that even on Ritalin, Elvin can only do work for approximately five minutes and watch television for approximately ten minutes before becoming distracted. (Tr. 31-32, 47.) Elvin also allegedly gets along "well" with other people

2

but is "real aggressive" and fights when playing with other kids. (Tr. 33, 44-45.) Elvin "listens to adults to a degree," outside of school. (Tr. 47.) The Plaintiff stated that Elvin did not have any problems using his arms or legs, had no problems with self care, and that Elvin's asthma was under control. (Tr. 34.)

Plaintiff additionally testified that in 1999, Elvin began trying to set fires on a daily basis. (Tr. 38.) Elvin attended a special program at Trinitras Hospital from November 2001 until March 2002 to help him control this behavior, and has not had this problem since. (Tr. 38.)

**B.      Medical, Psychological and Teacher Evaluations**

The record contains various medical, psychological, and teacher reports on Elvin's condition. To the extent possible, this evidence will be addressed chronologically in order to show the evolution of Elvin's Attention Deficit Hyperactivity Disorder ("ADHD").

*1. Elizabeth General Medical Center Pyschiatric Evaluation: February 1999*

This report by Dr. Susan Borja describes Elvin as a "5-year-old hyperactive . . . boy." (Tr. 144.) At the evaluation, Elvin was "constantly running around the room," and could not be stopped. (Tr. 144.) He was "aggressive" and "impulsive," and could only sit in a chair for a few minutes before becoming distracted again. (Tr. 144.) Elvin needed to be "redirected constantly." (Tr. 144.) Dr. Borja diagnosed Elvin with Attention Deficit Disorder and suggested Ritalin. (Tr. 145.)

*2. Trinatas Hospital Pyschological Evaluation: November 7, 2000*

This is a summary of Dr. Christopher Stucky's evaluation of Elvin. Dr. Stucky characterizes Elvin as "very restless," and "quite inattentive." (Tr. 130.) Dr. Stucky's "diagnostic impression," was ADHD. (Tr. 131.) Dr. Stucky indicated that Elvin's symptoms

3

were "improved significantly with Ritalin." (Tr. 131.)

### 3. *New Jersey Division of Disability Determination Services Report: May 7, 2001*

This report is given by Dr. Najib from New Jersey Medical Services. It describes Elvin as a "7-year-old boy with asthma and attention deficit hyperactivity disorder." (Tr. 146, 148.) According to Dr. Najib, Elvin "has a short attention span . . . is distracted . . . fights with other children . . . [and] is impulsive." (Tr. 146.) At this time Elvin was on 10 mg of Ritalin a day. (Tr. 147.)

### 4. *New Jersey Division of Disability Determination Services Report: June 2, 2001*

Dr. Alvaro Gutierrez examined Elvin and found him "cooperative and verbal." (Tr. 150.) Elvin had "a short attention span, but he did not show evidence of hyperactivity." (*Id.*) Dr. Gutierrez indicates this is probably because "there was structure during the evaluation." (*Id.*) Elvin said that he felt the teacher gave him too much work. (Id.) Elvin's intellectual functioning was average. (*Id.*) In Dr. Gutierrez's opinion, "the limitation of the social, personal, occupational, and travel spheres . . . are secondary to [Elvin's] mental status." (Tr. 151.) Gutierrez diagnosed Elvin with ADHD. (*Id.*)

### 5. *Second Grade Teacher's Questionnaire, 2001*

This questionnaire was included in the Division of Disability Determination Services Report in 2001 and was answered by Elvin's second grade teacher ("the teacher"). (Tr. 152.) The questionnaire asked Elvin's teacher to evaluate him according to six functional domains: (1) Acquiring and Using Information, (2) Attending and Completing Tasks, (3) Interacting and Relating with Others, (4) Moving About and Manipulating Objects, (5) Caring for Himself, and (6) Health and Physical Well-Being. The teacher could rate Elvin on each area included in a

domain as "no problem," "a slight problem," "an obvious problem," "a serious problem," or a "very serious problem."

In the first domain, Acquiring and Using Information, the teacher rated Elvin overall as having "an obvious problem." (Tr. 153.) Elvin had a very serious problem in providing organized oral explanations and expressing ideas in written form, as well as learning new material and applying problem solving skills. (*Id.*) He had a serious problem comprehending oral instructions and written material, as well as recalling learned material. (*Id.*) Elvin had an obvious problem with vocabulary, math problems, and participating in class discussions. (*Id.*)

In the second domain, "Attending and Completing Tasks," the teacher indicated that Elvin had a slight problem in paying attention when spoken to, carrying out single-step instructions, and completing work without careless mistakes. (Tr. 154.) He had an obvious problem sustaining attention during play and focusing to finish activities and classwork. (*Id.*) Elvin had serious problems refocusing and working at a reasonable pace. (*Id.*) He had a very serious problem with carrying out multi-step instructions, working or changing activities without disruptions, and organizing his things. (*Id.*)

In the third domain, "Interacting and Relating with Others," Elvin had slight problems in most of the areas, including expressing anger appropriately, respecting adults, maintaining conversations and telling stories. (Tr. 156.) Elvin had a serious problem playing with other children and making friends. (*Id.*) He had a very serious problem seeking attention appropriately and following rules. (*Id.*)

According to the teacher, Elvin had no problems in the fourth domain, "Moving about and Manipulating Objects." (Tr. 157.) As for the the fifth domain, "Caring for himself," Elvin

had no problems with personal hygiene, caring for his physical needs, taking his medicine, and knowing when to ask for help. (Tr. 158.) The teacher indicated Elvin had a slight problem with asserting his emotional needs. (*Id.*) Elvin demonstrated a serious problem in responding to changes in his mood and using good judgment regarding his personal safety. (Id.) Finally, Elvin had serious problems in areas more closely related to other domains, such as handling frustration and being patient. (*Id.*) Elvin had no problems in the sixth domain, Health and Physical Well-Being.

### *6. Dr. Tillman's Report: June 18, 2001*

Dr. Tillman, a Social Security Administration doctor, evaluated the evidence in the record and concluded that Elvin had ADHD, that his ADHD was a severe impairment, but that it did not "meet, medically equal, or functionally equal the listings" of recognized disabilities under the Social Security regulations. (Tr. 161.) Dr. Tillman evaluated the seriousness of Elvin's ADHD in the aforementioned functional domains, using the criteria "no limitation," "less than marked," "marked," and "extreme." (Tr. 163-164.) Dr. Tillman found "less than marked" limitations in the domains of Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating With Others, and Health and Physical Well-Being. (*Id.*) He concluded that Elvin had "no limitation" in the domains of "Moving About and Manipulating Objects" and "Caring For Himself." *(Id.)* Tillman's reason for finding a less than marked limitation with respect to Acquiring and Using Information is that on medication Elvin "has been able to be more independent and able to learning [sic]." (Tr. 163.) The reason stated for finding a less than marked limitation in Attending and Completing Tasks was that Elvin's ADHD was improved on Ritalin and Elvin was "able to work independently and complete tasks in regular class setting,"

6

according to Elvin's first grade teacher's statements on a phone call. (*Id., see* Tr. 167 (indicating telephone conversation with Elvin's first grade teacher).) Again, based on Elvin's teacher's statements, Dr. Tillman concluded that Elvin had a less than marked limitation in Interacting and Relating With Others, because Elvin's problems with "impulsive acting out' had improved with medication and had become "more minor and less frequent." (Tr. 163) Additionally, Dr. Samuel Kaye concluded that Elvin's asthma was not a severe impairment.

### 7. *Trinitas Day Treatment Program Discharge Summary: November 16, 2001*

This summary from the Trinitas Day Treatment Program, where Elvin was referred for his fire-setting, indicates that Elvin requires "moderate supervision" and can be "easily redirected." (Tr. 127.) It diagnoses Elvin with ADD and Asthma. (*Id.*) It also recommends that Elvin be placed in a regular school, continue to attend the fire-setting group weekly, and that Elvin have "consistent structure and limit setting." (*Id.*)

### 8. *Dr. Gash's Report: December 21, 2001*

Dr. Gash, a Social Security Administration psychologist, evaluated the evidence in the record during the reconsideration process and determined that Elvin had ADHD, that his ADHD was a severe impairment, but that it id not "meet, medically equal, or functionally equal the listings" of recognized disabilities under the Social Security regulations. (Tr. 174.) Dr. Gash concluded that Elvin had "less than marked" limitations in the Acquiring and Using Information, Attending and Completing Tasks, Caring for Himself, and Health and Physical Well-Being domains. (Tr. 176-177.) He reported that he had communicated with Elvin's treating physician, Dr. Stuckey, who indicated that Elvin was "doing well in school and much improved with medication." (Tr. 176.) Dr. Gash concluded that the "teacher's indications of problems appear

more related to social factors." (*Id.*) Dr. Gash's conclusion on "Attending Completing Tasks" was based on the teacher reporting that Elvin could "follow simple instructions," and again stated that the "teacher's negative comments appear related to social factors." (*Id.*) Dr. Gash found a "marked" limitation in the domain of "Interacting and Relating with Others," citing Elvin's teacher's report. (*Id.*)

### 9. Ms. Barrier's Teacher Questionnaire: November 8, 2002

Ms. Barrier was Elvin's third grade teacher. Barrier indicated that "Elvin does not work independently." (Tr. 217.) Ms. Barrier was asked to evaluate Elvin using the same teacher questionnaire as in (6), and using the same rating scale. (*Id.*) In the first domain, Elvin had a "very serious problem" reading and comprehending material and learning new material. (*Id.*) Elvin had a "serious problem" with numerous areas, including vocabulary, doing math problems, understanding class discussions, and expressing his ideas orally and in writing. (*Id.*) Elvin had an "obvious problem" comprehending oral instructions.

In the second domain, "Attending and Completing Tasks," Elvin had "a very serious problem" in numerous areas on a daily and hourly basis. (Tr. 218.) He had very serious problems sustaining attention during play and during work long enough to finish a task, as well as in carrying out multi-step instructions, waiting to take turns, completing work and homework, and in making careless mistakes. (*Id.*) He had a serious problem in carrying out single-step instructions and working without distracting himself and others. (*Id.*) He had an obvious problem paying attention when spoken to directly and in transitioning from one activity to another. (*Id.*) Ms. Barrier reported that she was concerned about Elvin's "lack of effort and concern," and that she often gives Elvin less work than the other students.

In the third domain, "Interacting and Relating with Others," Ms. Barrier rated Elvin much better. Here Elvin had "a slight problem" in most of the areas, including expressing anger appropriately, following rules, asking permission, relating stories and maintaining a conversation, and most of his problems occurred weekly rather than daily or hourly. (Tr. 219.) Elvin had an obvious problem in playing appropriately with the other children and making friends. (*Id.*) However, Elvin often "used inappropriate langauge," and would provoke fights with his words. (Id.) He had a "very serious problem" with seeking attention appropriately. (*Id.*)

In the fourth domain, "Moving About and Manipulating Objects," Ms. Barrier may have misunderstood the questionnaire as more questions about Elvin's hyperactivity rather than his actual ability to perform motor activities. For instance, she indicates that Elvin has a "very serious problem" in "moving body from one place to another," and "moving and manipulating things," and yet in her comments section indicates that Elvin will take his coat or bookbag off and bang it into another student and that he "does not stay still." (Tr. 220.)

In the fifth domain, "Caring for Himself," Ms. Barrier indicated that Elvin had "no problem" in the most relevant areas, such as taking care of his personal hygiene, caring for physcial needs, taking his medications, and knowing when to ask for help. (Tr. 221.) The areas where Elvin had problems were more related to attention and social problems, including handling frustration, being patient, calming himself, and asserting his emotional needs. (*Id.*) Elvin had no problems in the sixth domain, Health and Physical Well-Being.

### 10. *Third Grade First Marking Period Report Card*

Elvin's report card shows grades of satisfactory, good, and excellent for his academic subjects and physical education. (Tr. 224.) The comment on the report card indicates, "Elvin

9

has lots of energy." (*Id.*)  In all nearly all areas of "Personal Development and Guidance," however, Elvin "needs improvement." (*Id.*)  These include behaving appropriately, respecting the rights of others, following directions, listening attentively, obeying rules, working well in groups and independently, and completing class work. (*Id.*)

## II.  THE ALJ'S OPINION

On February 12, 2003, the ALJ concluded that Elvin was not "disabled" within the meaning of the Social Security Act. (Tr. 15.)

The ALJ cited the appropriate standard for determining childhood disability. (*See Id.*)  First, the child must show that he is not working in a substantially gainful activity. 20 C.F.R. § 416.924(b).  Second, the child "must have a medically determinable impairment(s) that is severe." 20 C.F.R. § 416.924(c).  The third step has two sub-parts: the child is disabled (1) if the severe impairment "meets, or medically equals the requirements of a listing[1]," or (2) if the severe impairment "functionally equals the listings." 20 C.F.R. § 416.924(d)(1)-(2).  A child's impairment is "medically equivalent to a listed impairment . . . if the medical findings are at least equal in severity and duration to the listed findings," comparing the evidence about the child's impairment to the "medical criteria shown with the listed impairment." 20 C.F.R. § 404.1526(a).  If the child's impairment does not medically equal a listed impairment, the child is nevertheless disabled if the impairment is "functionally equivalent" to a listing.  The impairment is "functionally equivalent to a listing" if the child has either an "extreme" limitation[2] in one or a

---

[1] Referring to the listing of impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[2] Defined as: "more than moderate but less than extreme." 20 C.F.R. § 416.926a(e)(2).

"marked"[3] limitation in two of the following six "domains:"

>(i) Acquiring and using information;
>(ii) Attending and completing tasks;
>(iii) Interacting and relating with others;
>(iv) Moving about and manipulating objects;
>(v) Caring for yourself;
>(vi) Health and physical well-being.  20 C.F.R. 416.926a(b)(1)(i)-(vi).

Elvin was nine at the time of the ALJ's decision.  (Tr. 16.)  The ALJ determined that Elvin had not engaged in substantial gainful activity.  (Tr. 16.)  The ALJ concluded that Elvin had ADHD, that his ADHD was a "severe impairment," and that his asthma was not "severe." (Tr. 16.)  The ALJ relied on the evaluation of "State agency pediatrics consultant Samuel Kaye, M.D.," who found that Elvin had not had any asthma attacks in the past twelve months nor any treatment, to find that Elvin's asthma was not "severe."  (Tr. 16.)

The ALJ then concluded that Elvin's ADHD did "not meet or medically equal the criteria of any of the listed impairments of Appendix 1, Subpart P, Regulations No. 4." (Tr. 16.)  The ALJ noted that "we have given great weight [to] State agency psychology consultant Ira Gash's ["Dr. Gash"] December 2001 disability assessment, and that nothing added thereafter calls this assessment into question." (Tr. 17.)  The ALJ found in that assessment that Elvin "had some judgment problems, and that [Elvin's] treating physician reported that [Elvin] is responding well to medication, that there have been no setbacks and that he displays improvement with medication and is doing well in school." (Tr. 17.)

Finding no medical equivalence, the ALJ then addressed each of the six functional domains used to determine functional equivalence with a listed disability. (Tr. 17-18.) The ALJ

---

[3]Defined as: "more than marked . . . the rating we give to the worst limitations."  20 C.F.R. § 416.926a(e)(3).

11

cited Dr. Gash's opinion that Elvin's limitation was less than marked, the November 2001 Trinitas evaluation, and Elvin's third grade grades as evidence that Elvin had a less than marked limitation in the first domain, Acquiring and Using Information. (Tr. 17.)

The ALJ concluded that Elvin had a less than marked limitation with respect to the second domain, Attending and Completing Tasks. (*Id.*) He again cited Dr. Gash's opinion on the issue. (*Id.*) The ALJ also stated that Elvin's "behavioral problems, distractability, his not completing schoolwork, and his need for structure," as reported by his teacher, did not rise to the level of a marked limitation.

Third, the ALJ concluded that Elvin did have a marked limitation in the domain of Interacting and Relating with Others. (*Id.*) The ALJ found the teacher's report instructive, because it stated that Elvin "seems incapable of working, socializing and studying independently, that he has a difficult time socializing with other children, and that he often argues and uses inappropriate language." (*Id.*) The ALJ found that the teacher report was consistent with Dr. Gash's assessment of a marked limitation in this domain. (*Id.*)

Fourth, the ALJ found that Elvin did not have any limitation in the domain of Moving About and Manipulating Objects, because there was nothing in the record to support such a limitation. (*Id.*) Fifth, the ALJ determined that Elvin had a less than marked limiation in the domain of Caring for Himself, relying on the teacher's reports and Dr. Gash's assessment that Elvin "shows largely adequate self-care and age-appropriate activities of daily living." (Tr. 18.) Finally, the ALJ found that Elvin did not have a marked limitation in the Health and Physical Well-Being domain, relying again on the teacher's report and Dr. Gash's report. (Tr. 18.)

In making his determinations, the ALJ concluded that as to the Plaintiff's testimony at the

hearing, "Even if taken at face value, nothing in the testimony indicates limitations that exceed those noted in the documentary evidence outlined above," that "Ritalin clearly is effective," and that "selective submission of evidence (for example, the missing second grade report card) further detracts from the credibility of the extent of functional disability alleged." (Tr. 18.)  As a result, the ALJ found that "the testimony as to the degree of limitations alleged cannot be accepted," and that Elvin "has not been under a 'disability' as defined in the Social Security Act, at any time through the date of this decision." (Tr. 18.)

## II. DISCUSSION

### A.     The Standard of Review

The court does not weigh the evidence or substitute its judgment for that of the ALJ. *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992).  If the ALJ's findings are supported by substantial evidence, they "must be accepted as conclusive by a reviewing court." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  "Substantial evidence is such relevant evidence as a reasoning mind might accept as adequate to support a conclusion." *Id*.  The ALJ must make some "expression of the evidence [he or she] considered which supports the result [and] also some indication of the evidence which was rejected." *Id.* at 705.  An ALJ's mere conclusion on a step of the disability evaluation process, without more, does not provide a court with a meaningful basis for judicial review. *Burnett v. Commissioner of Social Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000).

However, "*Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)  Thus, if the ALJ's opinion " read as a whole" shows that the ALJ considered the factors

13

that would be relevant to the disability determination, the *Burnett* standard is satisfied. *Jones*, 364 F.3d at 504-505.

**B.     Whether the ALJ's Determination Regarding Medical Equivalence Provided a Meaningful Basis for Judicial Review**

In this case, the ALJ's opinion does not provide a meaningful basis for judicial review on the issue of whether Elvin's ADHD met or medically equaled a listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

The ALJ satisfied the first two steps of the child disability analysis by concluding that Elvin was not working and that Elvin had a severe impairment, ADHD. (Tr. 18.)[4] The ALJ, however, provides only conclusory statements regarding the medical equivalence sub-part of step three: "the undersigned finds that the claimant's attention deficit hyperactivity disorder (ADHD) is a severe impairment within the meaning of the regulations but that it does not meet or medically equal the criteria of any of the listed impairments of Appendix 1." (Tr. 16.) Though the ALJ stated that his conclusions would be "further explained below," and went forward to evaluating the evidence presented in three pages (Tr. 18-19), the remainder of the ALJ's discussion focuses entirely on functional equivalence, not medical equivalence. Indeed, most paragraphs begin with the phrase, "with regard to the domain involving," followed by a discussion of a functional equivalence domain (*See* Tr. 17-18.) This indicates that the ALJ's discussion of the evidence is not related to the ALJ's medical equivalence determination, but rather only to the subsequent functional equivalence step in the disability analysis process.

The ALJ never mentions in his opinion the relevant listing for this case, "Attention

---

[4]Plaintiff does not seriously challenge the ALJ's finding that Elvin's asthma was not severe, a finding that was amply supported by the medical evidence in the record.

Deficit Hyperactivity Disorder," 20 C.F.R. Pt. 404, Subpt. P, App.1, § 112.11.  This provides further support for Plaintiff's contention that the ALJ's opinion does not provide a meaningful basis for judicial review. It is true that failure to explicitly state the relevant listing in a medical equivalence determination is not necessarily fatal.  *See Jones*, 364 F.3d at 504-505 (affirming ALJ's determination even though ALJ did not state which listing applied, because opinion read as a whole showed that ALJ considered criteria of relevant listing) .  Unlike *Jones*, however, read as a whole, the ALJ's opinion in this case does not provide any indication the ALJ considered the proper factors when determining that Elvin's ADHD was not medically equivalent to the listing for ADHD.

      For a child diagnosed with ADHD to have the "required level of severity" of ADHD to medically equal the listing and qualify as disabled, the child must have medically documented findings of "marked inattention," "marked impulsiveness," and "marked hyperactivity" resulting in marked impairments in at least two of the following: "age-appropriate cognitive/ communicative function;" "social functioning;" "personal functioning;" or "maintaining concentration, persistence or pace."  *Id.* at §§ 112.02(B)(2)(a)-(d), 112.11.  The ALJ never discusses the extent of Elvin's inattention, impulsiveness and hyperactivity *per se*, nor the inter-relationship between these conditions and Elvin's social functioning or ability to maintain concentration, persistence, and pace.  Before the "domain" paragraphs, the ALJ does cite Dr. Gash's disability assessment, and that "nothing added thereafter calls this assessment into question." (Tr. 17.)  However, not even Dr. Gash's assessment focused specifically on the criteria to determine medical equivalence to the ADHD listing.  (*See* Tr. 174-179.)  Instead, Dr. Gash's opinions related specifically to the functional equivalence domains.  (*See Id.*)  Thus there

is no way for this Court to determine if the ALJ actually did compare Elvin's ADHD to the listing for ADHD and found a lack of medical equivalence as a result of weighing the evidence, or if the ALJ ignored the listings entirely. Therefore, pursuant to *Burnett*, this Court cannot say the ALJ's determination was supported by substantial evidence because this Court cannot conduct a meaningful review of the ALJ's decision. As a result, this Court must reverse and remand to the ALJ for an explicit account of how Elvin's ADHD compared to the listing for ADHD. *See Burnett,* 220 F.3d at 119 (remanding because of mere conclusion in ALJ's opinion on a step of the disability evaluation process).

C.   **Functional Equivalence Determination**

The ALJ's opinion in this case did not present a meaningful basis for judicial review as to the ALJ's determination of medical equivalence in the first sub-part of the third step of the childhood disability evaluation process. Therefore, the Court need not evaluate the Plaintiff's contention that there was not substantial evidence to support the ALJ's functional equivalence determination because the ALJ improperly relied exclusively on non-treating experts' opinions. However, it should be noted that the ALJ's opinion also did not provide a meaningful basis for judicial review of the functional equivalence determination. The ALJ did decide that Elvin had a marked limitation in the domain of Interacting and Relating with Others. (Tr. 17.) However, as for the domain of Attending and Completing Tasks, the entirety of the ALJ's analysis was:

> With regard to the domain involving attending and completing tasks, Dr. Gash opined that the claimant's degree of limitation was less than marked (Exhibit 9F). While the claimant's teacher has complained of behavioral problems, distractibility, his not completing schoolwork, and his need for structure (Exhibit 14F), this nevertheless does not rise to the level of a marked limitation in this domain. (Tr. 17.)

For the domain of Attending and Completing Tasks, the ALJ should consider how well the child can maintain his attention, and "begin, carry through, and finish" his activities. 20 C.F.R. § 416.926a(h). A child in Elvin's age group should be able to "follow directions," "organize school materials," and "complete . . . assignments." 20 C.F.R. § 416.926a(h)(2)(iv). The child should also be able to "complete a transition task . . . without extra reminders and accommodation." *Id*. The ALJ may also consider in deciding functional equivalence: (1) how well the child initiates and sustains activities, including "the effects of structured or supportive settings;" (2) school functioning; and (3) effects of medications or treatment. 20 C.F.R. § 416.926a(a)(1)-(3).

The teachers' questionnaires, which contain the opinions of individuals who interact with Elvin daily, state that Elvin has "obvious problems," and "very serious problems" in numerous areas with regard to the functional domain of Attending and Completing Tasks (Tr. 154, 218), and are thus probative evidence on that issue. In his discussion of other functional domains, the ALJ relied in part on the teacher questionnaires. (*See* Tr. 17-18.) In addition, previous psychiatric evaluations had referred to Elvin's inattentiveness and inability to focus. *(See* Tr 146-151.) *Cotter* recognized that, "that there is a particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record." 642 F.2d at 706. Thus, on remand, the ALJ should be careful to explicitly state ***the reasons why*** he rejects this evidence in favor of Dr. Gash's assessment, and ***why*** this evidence is insufficient to constitute a "marked limitation" in the domain of Attending and Completing Tasks.

### *III. CONCLUSION*

The Commissioner's decision to deny SSI benefits to Elvin Morales is REVERSED and REMANDED for further proceedings consistent with this opinion.

   /s/Dickinson R. Debevoise   
DICKINSON R. DEBEVOISE, U.S.S.D.J.

DATED: Monday, June 27, 2005